Filed 8/14/25  In re M.T. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION SEVEN

| | |
|---|---|
| In re M.T., a Person Coming Under the Juvenile Court Law. | B339384 |
| | (Los Angeles County Super. Ct. No. LB0257A) |
| THE PEOPLE OF THE STATE OF CALIFORNIA, | |
| Plaintiff and Respondent, | |
| v. | |
| M.T., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sabina A. Helton, Judge.  Affirmed.

Courtney M. Selan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kenneth C. Byrne and Stephanie C. Brenan, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

M.T., a minor at the time the offenses were committed, appeals the juvenile court's disposition order sustaining a petition under Welfare and Institutions Code section 602 for attempted murder and illegal possession of a firearm. The court declared M.T. a ward of the court and ordered him placed in a secure youth treatment facility for a baseline term of three years. M.T. argues the prosecution's use of statements he made in a police van after his arrest violated his Fifth Amendment rights because they were the product of a custodial interrogation and, as a minor, he should have received additional warnings about the van's recording. We conclude the law does not support M.T.'s arguments, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Offenses*

Approximately a year before May 1, 2023, minor E.R. saw M.T. with Q.M., E.R.'s high school classmate, at a high school football game. E.R. learned that M.T. and Q.M. were friends. E.R. was also "friends" with Q.M. on social media. While viewing Q.M.'s social media page, E.R. encountered M.T.'s social media account.

On May 1, 2023, E.R., a known seller of vaping devices, received a text message from an unknown number about a potential sale. After discussing the quantity, price, and place of the sale, E.R. drove to the agreed-upon location near an apartment complex around 6:30 p.m. E.R. waited 10 to 15 minutes. A person whom E.R. did not know approached E.R.'s car. As the pair discussed payment, E.R. saw someone walking behind the vehicle from the rearview mirror.

Growing suspicious of the person approaching, E.R. began rolling up the driver's side window. The person approaching from behind the vehicle had a small blue pouch and was wearing a ski mask with his eyes and the top of his nose visible. E.R. recognized him as M.T. As he rolled up the window, the masked person shot through the driver's side window, and the bullet struck E.R. on the left side of his face.

E.R. drove away to a convenience store parking lot. He called 911. Emergency services transported E.R. to the Long Beach Memorial Hospital and then transferred him to UCI Medical Center. E.R. received medical treatment and then underwent surgery to remove the bullet and bullet fragments.

On May 2, 2023, Long Beach Police Detectives Sokhoeun Kim and William Sentelle met with E.R. E.R. was intubated and could not speak. He used a notepad to communicate with the detectives. He provided the detectives with the social media accounts for M.T. and Q.M. E.R. then showed detectives photographs on social media and identified M.T. as the person who shot him.

Multiple photographs depicted M.T. in front of a gas station, which E.R. believed to be across from the convenience store where E.R. called the police. In one photograph, the street

3

sign was visible and confirmed the location to be across from the street of that convenience store. Another photograph showed M.T. holding a small blue pouch with the caption indicating the post would be deleted in 30 minutes. Within a day or two, M.T.'s social media account was deactivated.

Officers executed a search warrant for the social media accounts provided by E.R. Officers received a phone number and email address associated with the social media account believed to belong to M.T. The phone number was connected to M.T.'s mother.

On July 26, 2023, officers responded to a report of a person being shot. Officer Charles Pruiet encountered M.T., Q.M., and R.J.B. Q.M. had just been shot in the chest near his underarm.

M.T. told Officer Pruiet he encountered Q.M. with a gunshot wound near an apartment complex. When Officer Pruiet searched the area by the apartment complex, he found a nine-millimeter bullet in the alley. Officers searched the surrounding area and discovered signs of gunfire involving two guns: eight nine-millimeter casings, two bullets that had struck a box truck parked on the street, two .45 caliber fragments near the box truck, and a bullet that struck the apartment complex's second-story window.

Police obtained video surveillance footage from the apartment complex's security cameras. The video showed M.T., Q.M., and R.J.B. M.T. and Q.M. were positioned behind a parked box truck as a white car arrived. M.T. and R.J.B. then met the person in the white car while Q.M. stayed behind the box truck. Q.M. then approached the white car. A minute later, M.T. and Q.M. began running away as Q.M. appeared to fire a gun twice in the white car's direction. R.J.B., shortly thereafter, joined them

4

running down the alley towards the location where officers found them.

B.    *M.T.'s Arrest*

On September 7, 2023, police executed a search and arrest warrant for M.T. and Q.M.[1]  After arresting the minors, officers read them their *Miranda* rights.[2]  The officers did not question M.T. or Q.M.  Both were escorted to a police van for transportation to juvenile hall.  The van was equipped with audio and video recording capacities.  Officers directed Q.M. to state his full name after placing him in the van.  After a few minutes, officers brought M.T. to the van, and when M.T. was inside, they directed him to state his name.  In his opening brief, M.T. concedes that "[i]t was clear that the detective was making a recording and he asked that both Q.M. and appellant state their names for the recording.  Appellant expressly acknowledged that they were being recorded" when he stated, "they got a camera in here."  The officers gave them each a copy of the search warrant,

---

[1]    M.T. moved to augment the record to include various *Miranda*-related documents, including a transcript of the van recording prepared by the prosecution, a police incident report confirming *Miranda* rights were provided to M.T. upon his arrest, and a police department manual regarding the form of *Miranda* warnings.  We grant the motion to augment the record with the transcript and the police incident report.  (See Cal. Rules of Court, rules 8.340, 8.155(a)(1)(A) [allowing augmentation to include "[a]ny document filed or lodged in the case in superior court"].)  The police manual was not provided to the trial court; it is unnecessary to our analysis, and we decline to augment the record with it.

[2]    *Miranda v. Arizona* (1966) 384 U.S. 436.

5

which contained photographs from M.T.'s social media account. The officers tended to paperwork outside of the van and left M.T. and Q.M. alone inside.

While in the van, M.T. and Q.M. spoke to each other. M.T. said: "We [are going to] have our lawyer make up a story. We know there isn't shit to it." Later, he stated: "Like how you get shot after you selling drugs to somebody, feel me?" and "I ain't got time to be gone and shit like this. At first I thought the Asian snitched." E.R. is of Cambodian descent.

Later in the conversation, M.T. referenced his social media account and said: "They tried looking at my account but that shit deactivated. They've been looking at this shit though. . . . They must have found something." Q.M. also mentioned a "30 stick," which Detective Hector Lizardo believed to be referring to an extended firearm magazine. M.T. and Q.M. were held in the van for almost an hour. Detective Lizardo reviewed and confirmed the van recording's transcript to the best of his ability.

C.      *Juvenile Court Proceedings*

The People filed a petition on September 8, 2023, to declare M.T. a ward of the juvenile court pursuant to Welfare and Institutions Code section 602. The petition alleged M.T. had committed attempted murder (count 1; Pen. Code, §§ 664, 187, subd. (a)), illegal possession of a firearm (count 2; Pen. Code, § 29610, subd. (a)), and attempted second degree robbery (count 3; Pen. Code, §§ 664, 211).

On February 26, 2024, M.T. moved to suppress his statements made in the police van. M.T. argued the audio recording was undiscernible as to who was speaking or what was being said and therefore the recording was unreliable and

6

prejudicial. M.T.'s counsel did not challenge the recording on *Miranda* grounds. The juvenile court denied M.T.'s motion.

The juvenile court sustained the petition for attempted murder, illegal possession of a firearm, and attempted second degree robbery. The court declared M.T. a ward of the court and ordered him placed in a secure youth treatment facility for a baseline term of three years.

M.T. timely appealed.

## DISCUSSION

M.T. contends the true findings for attempted murder (count 1) and illegal possession of a firearm (count 2) should be reversed for violation of his right against self-incrimination.[3] M.T. argues that the admission of his statements made while in the police van violated his Fifth Amendment rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

A. *Governing Law and Standard of Review*

"The Fifth Amendment of the United States Constitution provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" (*Colorado v. Spring* (1987) 479 U.S. 564, 572.) *Miranda* held the Fifth Amendment guards against "'mental as well as physical'" coercion by law enforcement during custodial interrogation. (*Miranda, supra*, 384 U.S. at p. 448.) *Miranda* also held that if a suspect was not informed of his right to remain silent and other constitutional rights,

---

[3]     M.T. presents no argument on appeal as to count 3.

statements made during a custodial interrogation are inadmissible under the Fifth Amendment.  (See *id.* at p. 444.)

*Miranda* safeguards exist when a person is in custody and in an interrogation.  (See *Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301 (*Innis*) [custodial interrogation involves "a measure of compulsion above and beyond that inherent in custody itself"].)  An interrogation refers to "express questioning" and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  (*Id.* at p. 301.)

The privilege against self-incrimination "protects an accused only from being compelled to testify against himself[] or otherwise provide the State with evidence of a testimonial or communicative nature[.]"  (*Schmerber v. California* (1966) 384 U.S. 757, 761.)  Additionally, a government agent may not compel a person to be a source of ""'real or physical evidence.'""  (*United States v. Wade* (1967) 388 U.S. 218, 222-223 (*Wade*), quoting *Schmerber,* at p. 764.)  There is "'no protection against compulsion to submit to . . . speak for identification.'"  (*Wade,* at p. 223.)

A suspect's age may also be a relevant consideration "'affect[ing] how a reasonable person' in the suspect's position 'would perceive his or her freedom to leave.'"  (*J.D.B. v. North Carolina* (2011) 564 U.S. 261, 271 (*J.D.B.*).)  Thus, if a minor's age is known or apparent to the officer at the time of police questioning, the minor's age should be considered in the custody analysis of the *Miranda* test.  (See *ibid.*)  (As further addressed below, the parties here all agree M.T. was in custody.)

We accept the trial court's finding of facts and reasonable inferences therefrom if they are supported by substantial evidence. (See *People v. Box* (2000) 23 Cal.4th 1153, 1194; *People v. Bradford* (1997) 14 Cal.4th 1005, 1033.) We independently determine whether the challenged statements were unlawfully obtained based on the undisputed facts and facts properly found by the trial court. (See *Bradford,* at p. 1033.)

B.      *The Van Recording Did Not Violate M.T.'s* Miranda *Rights*[4]

M.T. acknowledges that he was read his *Miranda* rights after he was arrested and before he was placed in the police van. He also concedes the officers did not question him in violation of these rights. M.T. instead contends he was in a custodial interrogation when placed in the van because interrogation "refers not only to express questioning, but also to any . . . actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect." M.T. further argues that, because of his age and lack of a criminal record, he "was therefore due" additional *Miranda* warnings about the van recording. As explained below, we conclude M.T.'s arguments are unsupported by the law.

As stated, a defendant must demonstrate he was in "custody" and subject to "interrogation" to invoke the protections of *Miranda*. (*Miranda, supra*, 384 U.S. at p. 444; *Innis, supra,* 446 U.S. at pp. 300-301; see *Thompson v. Keohane* (1995) 516 U.S. 99, 102; *People v. Young* (2019) 7 Cal.5th 905, 923;

---

[4]      Although M.T. did not object on *Miranda* grounds before the juvenile court, the People responded to M.T.'s *Miranda* argument in the respondent's brief, and we exercise our discretion to reach the issue.

9

*People v. Alvarez* (2022) 75 Cal.App.5th 28, 32.) M.T. and the People concede that M.T. was in custody after his arrest and while in the van. Accordingly, we examine whether M.T.'s placement in the van with recording capabilities constituted an interrogation for purposes of *Miranda.*

An interrogation is "express questioning or [] functional[ly] equivalent" words or actions. (*Innis, supra,* 446 U.S. at pp. 300-301; *People v. Gamache* (2010) 48 Cal.4th 347, 387. An interrogation does not include spontaneous utterances that were not in response to questions from police officers or their known agents. (See, e.g., *People v. Siripongs* (1988) 45 Cal.3d 548, 575 [a defendant's spontaneous statement made after his arrest and while being searched is admissible]; *People v. O'Sullivan* (1990) 217 Cal.App.3d 237, 241 [a defendant's spontaneous utterance is admissible even in the absence of *Miranda* warnings].) Additionally, investigatory tactics "'that do not rise to the level of compulsion or coercion to speak are not within *Miranda's* concerns.'" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1402 [*Miranda* warnings not required before conversation between defendant and his father in an interrogation room, where officers "did not compel or coerce defendant to talk to his father"]; accord, *Illinois v. Perkins* (1990) 496 U.S. 292, 297.)

Here, after arresting M.T., officers informed M.T. of his *Miranda* rights. The officers placed M.T. into the van and asked him to state his full name, apparently for the recording. But the officers did not ask M.T. any questions. The officers did not say or do anything to elicit statements from M.T. In other words, although M.T. was in custody, the officers did not interrogate him through express questioning or functionally equivalent actions or words designed to elicit an incriminating statement. And, as the

10

People note, the police did not compel or coerce M.T. to speak to Q.M., nor was Q.M. acting as an agent of the police. Accordingly, we conclude M.T. was not in a custodial interrogation when he made the challenged statements.[5]

M.T. asserts that although he had already received a *Miranda* warning, he should have been given additional warnings when placed in the van because he was a minor, and it was unreasonable "for police to assume that [M.T.] understood the *Miranda* warnings extended to the interior van recording." For this proposition, M.T. relies on *J.D.B., supra,* 564 U.S. 261. But that case does not hold that minors must receive additional *Miranda* warnings or that officers must ensure such arrestees subjectively understand their scope. In *J.D.B.,* the United States Supreme Court examined "whether the age of a child subjected to police questioning is relevant to the custody analysis of *Miranda*" and it held that "a child's age properly informs the *Miranda* custody analysis." (*J.D.B.,* at pp. 264-265.) *J.D.B.* does not help M.T because there is no dispute that M.T. was in custody. Additionally, M.T. makes no reasoned argument explaining how *J.D.B.* should be extended to interrogations. Although *J.D.B.* observed at page 272 that minors "'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them,'" it did not address whether additional *Miranda* warnings are required under circumstances like those presented in this case.

---

[5] Indeed, M.T. concedes that, "[s]tatements made while in custody but outside of formal interrogation have in many instances not yet formed a basis for relief under a *Miranda* theory, or under any other Fifth Amendment concern."

11

M.T. also contends he did not knowingly, voluntarily, or intelligently waive his *Miranda* rights when he made the challenged statements. A person in custodial interrogation may waive his or her *Miranda* rights if the person knowingly, voluntarily, and intelligently waives their rights. (See *People v. Tate* (2010) 49 Cal.4th 635, 641, 683.) As stated, M.T.'s statements were not the product of an interrogation. Therefore, we need not determine whether M.T. knowingly, voluntarily, and intelligently waived his *Miranda* rights.[6]

## DISPOSITION

The juvenile court's disposition order is affirmed. The motion to augment the record is granted in part and denied in part as noted in the opinion.

MARTINEZ, P. J.

We concur:

SEGAL, J.                          STONE, J.

---

[6] Because we consider M.T.'s *Miranda* argument on the merits, we also need not reach his claim of ineffective assistance of counsel.